JUL 31 2026 PM3:59
FILED - USDC - FLMD - ORL

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

JOHN DOE,

    Plaintiff,

v.                                Case No. 6:26-cv-01481-JSS-RMN

THE FLORIDA BAR; ASHLEY MORRISON, in her official
and individual capacities as Bar Counsel for The Florida
Bar; JOSHUA E. DOYLE, in his official and individual
capacities as Executive Director of The Florida Bar; and
GYPSY BAILEY, in her official and individual capacities
as General Counsel for The Florida Bar,

    Defendants.

_____/

## PLAINTIFF'S TIME-SENSITIVE VERIFIED MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION

Plaintiff John Doe, pro se, moves under Federal Rule of Civil Procedure 65 and Local Rules 6.01 and 6.02 for a temporary restraining order and preliminary injunction, and in support states:

### INTRODUCTION

This motion is time-sensitive under Local Rule 3.01(f): probable cause has been found in all seven matters, and a formal complaint may be filed at any time. Plaintiff requests a ruling on or before August 14, 2026.

1

This is about fundamental First Amendment Political Speech and Strict Scrutiny – concepts for which Plaintiff knows this court does not need a primer. As discussed herein, Plaintiff carefully vetted every single statement he actually made and has provided proof to the Bar's averted eyes. The remaining statements that plaintiff did not make are constituted from hysteria of a complainant with a personal grudge against the Plaintiff recruited by the campaign machinery of an incumbent judge with a debatable rhetorical past facing the electorate for the first time apparently desperate to hide his past words about: race/affirmative action prejudicing his child despite his child nor he every lynching anyone, robed "priest kings" that constitutionally must be paid but should be stripped of electricity and secretaries until they relent to his (past) political preferences, and, among other topics ripe for public debate, his personal and pointed criticisms at the Florida Supreme Court, while he was a licensed attorney which he published on the Internet for years if not decades until some unknown point between when he became a magistrate and when he became a judge when they all just vanished from the Internet.

The Florida Supreme Court point alone makes this case also a prime example of an Equal Protection question of great public importance related to the public's right to be informed of the makeup of the judiciary versus the judiciary's apparent desire to be inoculated from criticism by attorneys – the people best situated to inform the public of the current state of the judiciary.

Plaintiff has documentation to prove every single one of these pertinent statements, including the book and the internet archive. And since at least February 2025, so does the defendant. Yet the Defendant is trying to continue the

2

work of silencing the Plaintiff as to these very relevant matters that were brought up during an election in which the voters were testing the judge for the first time.

If these circumstances do not beg for federal intervention, immediately, the plaintiff has no idea what would. After two years of stagnation only re-animating on the business day before qualifying for the 2026 election season, defendants cannot in good faith claim that the pause requested by this restraining order and preliminary injunction will in anyway prejudice them other than by giving the court time to determine whether the defendant is violating the constitution of the United States of America.

## PROCEDURAL COMPLIANCE

**Notice.** This motion is not made ex parte. Plaintiff transmitted by email to Defendants' counsel a copy of this motion, the operative Verified Amended Complaint, and every supporting paper. Plaintiff does not contend notice is impractical and does not oppose a hearing if the Court prefers one.

**Local Rule 6.01(c).** Contemporaneously with this motion, and before requesting any relief on it, Plaintiff served on Defendants' cousel every paper Local Rule 6.01(c) requires with respect to Plaintiff's prior motion and this one and files the accompanying Notice of Compliance and Certificate of Service.

**Evidentiary basis.** Pursuant to Local Rule 6.01(a)(2), this motion is supported by the Verified Amended Complaint filed contemporaneously.

## PLAINTIFF'S BURDEN

Plaintiff must show a substantial likelihood of success on the merits, irreparable injury absent relief, that the threatened injury outweighs any harm the injunction would cause the opposing party, and that the injunction would not

3

disserve the public interest. *Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7, 20 (2008); *Siegel v. LePore*, 234 F.3d 1163, 1176 (11th Cir. 2000) (en banc). Each element is met, and the showing on the merits is met four ways.

## LIKELIHOOD OF SUCCESS ON THE MERITS

**I. The Bar is knowingly prosecuting true speech under a rule requiring falsity and another rule and an Oath that define no conduct at all to punish Plaintiff, at all costs, for his political statements.**

We start at the beginning of Judge-Opponent's campaign. At its opening event — in a speech also posted to Facebook — Judge-Opponent emphasized three things: his military career, his book, and his record of service. The coincidence was notable at the time, because Plaintiff had already identified those areas as weaknesses for Judge-Opponent; Plaintiff later learned that Judge-Opponent had received campaign intelligence from a disgruntled former friend of Plaintiff, described in Section II, infra. Compl. ¶ 129. At that point, Plaintiff had made no statement on any of the three topics. Judge-Opponent placed all three into play for the election. As a trial attorney would say, Judge-Opponent "opened the door." The Bar is standing on the other side of the door with every disciplinary weapon they are privileged to carry pointed at the Plaintiff without as much as a "*Terry* Stop" worth of evidence.

What the Bar doesn't understand is that Plaintiff engaged in a level of vetting of information well-above the standard of local elections and the Bar seems confused by it and therefore, reflexively, must punish it.

--------[Negative Statement About Judge = Punish Lawyer]--------

4

Despite that measured approach, Judge-Opponent and his supporters projected onto Plaintiff motives and behavior that simply did not occur, to the point that a hysteria developed within the opponent's campaign marked by delusions leading to defamatory allegations, including of criminal behavior "targeting" supporters, which the bar has, sadly, adopted wholesale without lifting a finger to corroborate at Plaintiff's ongoing expense. The truth - backed with evidence previously provided to the bar and buried from the grievance committee - is plaintiff pointed out statement his opponent wrote and publicly asked his supporters how they felt.  That is not harassment under any definition of the word. It's basic public square stuff. Pointing out flaws to a candidate's supporters fundamental campaigning - moving voters from one side to the other. This is obvious.  If those supporters were embarrassed by association with Judge-Opponent's words, they should not have publicly endorsed Judge-Opponent — and the Bar has no business choosing the methods by which Plaintiff informed anyone, of past writings of Plaintiff's opponent.

During the 2024 campaign, Plaintiff mostly spoke about three things: Judge-Opponent's military service record, a conviction Judge-Opponent had not disclosed on a prior application for a magistrate position, and the contents of a book Judge-Opponent wrote and published. Compl. ¶¶ 18-49. Before speaking, Plaintiff obtained the records. Plaintiff submitted a Freedom of Information Act request for the service records and made no statement about the service until the records were in hand. Compl. ¶¶ 29-34. Judge-Opponent's first public protest — accusing Plaintiff, on Judge-Opponent's campaign Facebook page, of "disparaging his military service" — came after Plaintiff posted the exact number of years, months, and days Judge-Opponent had actually served, and observed

5

that Judge-Opponent had originally promised six years of service in exchange for his free, world-class education from West Point — an education Judge-Opponent spoke of constantly on the campaign trail and highlighted on the cover of the Orange County Bar Association magazine shortly before the campaign. Compl. ¶¶ 20-28.

Plaintiff obtained the criminal history by public records request. Compl. ¶¶ 51. Judge-Opponent's judicial application stated that the community service arising from that conviction had been completed. The court record shows otherwise: Judge-Opponent signed a statement, submitted to the court, that Judge-Opponent may have violated the conditions of probation by not completing the community service, and asked the court to buy out that service — a request granted toward the end of the probationary period. Compl. ¶¶ 123-127.

As for the book — which Judge-Opponent published and kept online for the better part of a decade or more, and which Judge-Opponent downplayed during the campaign by referring to it as a pamphlet — Plaintiff recognized that Judge-Opponent's words spoke for themselves and that no editorializing was needed. Throughout the campaign, Plaintiff read the words from the book: words Plaintiff found, and still finds, offensive; words that unfairly and dishonestly criticize the federal and state judiciaries, written as a lawyer in ways the courts were unable to answer, based on decisions Judge-Opponent disagreed with. Whether a person who wrote those words should continue to be a judge, after an appointment never tested by the voters, was certainly relevant for the voters to decide. Compl. ¶¶ 10-11.

In any case, the irony that the person who wrote those words is a judge, and the plaintiff is a respondent in a Florida bar prosecution for the past two

6

years is inescapable, and it demonstrates a breakdown in the system that only the uniquely independent Federal courts can address

Plaintiff quarantined information about the details of another arrest that did not result in a conviction in a demonstration of the self-governance Plaintiff is accused of lacking. Plaintiff weighed the equities and determined that although release would have been highly advantageous to Plaintiff's personal position, it would harm the judiciary in ways Plaintiff did not want to steward. Compare that to the microscopic level of self-governance shown to date in this matter by the complainants, Bar counsel, and Bar leadership. Compl. ¶¶ 55-61. Before Plaintiff's largest release, Plaintiff convened his campaign committee — lawyers and non-lawyers — and went through every item, one by one, against the law as they understood it. Compl. ¶¶ 58-61.

When Plaintiff announced his view on a disputed issue of public policy, Plaintiff did so by the book — literally. Plaintiff had found *White* in *An Aid to Understanding Canon 7*, the Supreme Court of Florida's publication for judicial candidates, and in the same statement in which Plaintiff announced his view, Plaintiff told voters Plaintiff would follow the law regardless of it — the assurance the canons governing judicial candidates exist to secure. Compl. ¶¶ 13-17, 139-145. Today, on July 31, 2026 after *White* and after the recent *Crowley* disciplinary opinion, the bar is still prosecuting the plaintiff for making this clearly constitutionally protected statement following the exact directions of the United States Supreme Court.

Plaintiff made that announcement after careful consideration, and after spending a year meeting face to face with voters in a way judicial candidates usually do not. What Plaintiff heard constantly was that voters' biggest concern

7

was that judges are not honest with them about who they are and what they believe — not in a partisan sense, but in the person-to-person sense that would make voters comfortable with these people making decisions for them.

The wife of Judge-Opponent filed a Bar complaint identifying that statement as a basis for discipline beause she didn't "think" politics should be involved. The Bar accepted it, consolidated it with six others, and has advanced it toward a probable cause determination for approximately two years. Compl. ¶¶ 146-147.

The issue is whether the First Amendment permits a state bar to prosecute a judicial candidate for truthful, documented statements about an opponent's record and for an announcement of views made in the very form the State prescribed. The rule answers it. *Republican Party of Minnesota v. White*, 536 U.S. 765 (2002), holds that a State may not prohibit a candidate for judicial office from announcing his views on disputed legal and political issues, and that restrictions on judicial campaign speech are subject to strict scrutiny. *Id.* at 774-75, 788. The State must show a compelling interest and narrow tailoring for every application of its rules to this speech. The Bar can show neither. Nobody could. The purpose of this requested relief is to give the bar time to try and if they can, then we must accept it if they cannot then the plaintiff rights are protected. It's a very simple concept the bar representing 110,000 lawyers who go to work every day protecting rights should not only agree with this premise, but they should not object to the temporary restraining order so that this can be sorted out correctly and without using time and power as an to punish a lawyer (as they did with Plaintiff's ADA request) based upon what is undeniably "speech" which makes it Constitutionally precious and worthy of extraordinary care. People died for

8

this – literally hung, shot, and beheaded by tyrants so that we can have this discussion today.

The Supreme Court of Florida's decision in *Florida Bar v. Crowley, No. SC2020-0529 (Fla. July 9, 2026)* confirms the trajectory of the law. *Crowley* held Rules 4-8.2(a) and 3-4.3 unconstitutional as applied to a candidate's campaign speech, and it forecloses any argument that the rules charged against Plaintiff may be applied to campaign speech without constitutional limit. *Crowley* arose from a partisan election for State Attorney and the court directly distinguished it from judicial races based on the partisan nature in its dicta. The distinction lies in the neutrality of judicial officers, not in the nature of political campaigns. No candidate owes a duty of neutrality toward his opponent. The neutrality is toward future litigants and controversies, none of which were implicated in this campaign. *White* already gives us guidance on that issue. Republican Party of Minnesota v. White, 536 U.S. 765 (2002). The State's remaining interest — the reputation of the judiciary — is constitutionally insufficient to suppress speech. *Landmark Communications, Inc. v. Virginia*, 435 U.S. 829, 841-42 (1978).

The First Amendment was not designed to expand over time toward its full potential. It is a black-and-white declaration of a fundamental right of all Americans, and it should be treated as such immediately, not when a State's Bar decides lawyers are finally worthy.

The State's conduct disproves any suggestion that public discussion of Judge-Opponent's record threatens the judiciary — because the judiciary discussed it. While the Bar advanced complaints against Plaintiff for truthful statements about Judge-Opponent's military service, the Ninth Judicial Circuit's official social media account promoted content concerning Judge-Opponent's

9

candidacy, during the period between qualifying and Election Day, contrary to published guidance directing courts to avoid posting the political activities of judges, to avoid making active candidates the primary focus of posts, and to avoid posting anything that would make the courts appear partial. Compl. ¶¶ 169-173. Among that content was an interview of Judge-Opponent, conducted by another judge of the same circuit, concerning Judge-Opponent's military service — the very subject Judge-Opponent's public biography understated at less than three years, the very subject Plaintiff had documented through federal records, and the very subject whose truthful discussion Judge-Opponent characterized as disparagement. Compl. ¶¶ 20-28, 40-43. The judiciary's official platform amplified the candidate's presentation of the subject; the judiciary's official arm prosecutes the challenger for stating what the records show about it. A State cannot claim a compelling interest in suppressing discussion of a judicial candidate's record while its courts publish that discussion themselves — selectively, for one side, in an election. *White*, 536 U.S. at 788.

Since the day is when the judiciary claimed that it was unable to address the public to defend itself, it has grown a media empire. In fact Florida led the nation and televising court proceedings and recently completed a five-year communications overhaul plan in 2021 which include included circuit specific public information officers as well as the statewide public information office for the courts. At least, in the media savvy state of Florida did the judiciary cannot in good faith claim that they're unable to address the public on matters of public importance.

Nor does compliance with Canon 7 protect a candidate from these charges, and that is the trap at the center of this case. Each of the seven consolidated

10

matters charges violation of the Oath of Admission and Rule 3-4.3. Neither defines any conduct. Neither requires any statement to be false. The Bar has described Plaintiff's statements as "disparaging" and "unprofessional" without ever stating what those words mean or what standard determines them — and a definition would not rescue the charges, because disparagement requires falsity, and no complainant and no Bar official has identified a false statement of fact by Plaintiff. Nor has "unprofessional" ever meant what the Bar needs it to mean here: George Washington, who as a young man copied out the Rules of Civility by hand, was not above colorful language in the fight — at war and in office — for the rights at issue in this case, and civility norms have never been thought to strip protection from pointed political speech. *Cohen v. California*, 403 U.S. 15, 25 (1971) ("one man's vulgarity is another's lyric"). Discipline has been reversed where the conduct charged was a single intemperate expression and the standard invoked could not bear the weight placed on it. *In re Snyder*, 472 U.S. 634, 646-47 (1985). Plaintiff cannot tell from the charging documents which statements are meant or what speech Plaintiff must refrain from to avoid further charges. Compl. ¶¶ 300-305. The State's publication collects the law that tells a candidate what he may say; the rules charged against him never tell him what he may not. A candidate who does exactly what the canons ask obtains no protection from prosecution under provisions that state no standard he could have violated. The law — from the First Amendment itself through the case law applying it — is clear that Plaintiff's political speech is protected speech. The Bar simply refuses to accept that fact, and continues its mission to punish Plaintiff on a concerning misinterpretation, or misapplication, of the Rules Regulating The

11

Florida Bar. Plaintiff is substantially likely to prevail on his First Amendment claims.

## II. The Bar ignored conclusive, objectively exculpatory evidence, erected a hurdle before it would consider exculpatory evidence or Plaintiff's grievances.

The seven consolidated complaints began arriving after Plaintiff announced his candidacy — at the most critical time of the election, in an effort orchestrated by Judge-Opponent, as stated within the first complaint received. Compl. ¶¶ 62-63. The first was filed by Michele Bernard, an attorney who assisted Judge-Opponent's campaign — filed on June 27, 2024, immediately after Plaintiff advised Bernard that Plaintiff intended to file a Bar complaint against Bernard. Compl. ¶ 66. Before Bernard filed, the Bar's ethics counsel found it necessary to instruct a licensed attorney on the importance of including only facts within her firsthand knowledge. Bernard noted that instruction in her complaint — and then rested the complaint almost entirely on what Bernard says others told Bernard. Whether Bernard sought to distance herself from the falsehoods Bernard was repeating, or simply did not comprehend the instruction Bernard herself referenced, is unclear. Compl. ¶¶ 73-74. The absurdity began with Bernard's first allegation: that of all the donors appearing on Judge-Opponent's campaign finance report, Plaintiff singled Bernard out as a target of harassment. The reality is that Plaintiff had no idea who Bernard was — until Plaintiff heard from multiple lawyers that Bernard was making statements about Plaintiff's mental condition that Bernard had no basis to make. The source of those statements was a disgruntled former friend of Plaintiff who, after a falling out, used a pseudonym to offer confidential campaign information to Judge-

12

Opponent's Facebook operation — an offer the record shows that operation accepted without reservation. Compl. ¶¶ 129-132.

On August 26, 2024, Plaintiff answered with proof. Plaintiff submitted a sworn complaint on the Bar's form, signed under penalty of perjury, identifying specific allegations in Bernard's complaint as false and identifying the public records by which each could be verified. Compl. ¶ 67. The records were not Plaintiff's say-so. Bernard alleged Plaintiff held an event with a political committee; the records of the Internal Revenue Service identify the organization as a nonprofit community organization, and the Florida Division of Elections has no record of it as a political committee. Compl. ¶ 68. Bernard alleged that Plaintiff himself posted campaign signs before the date campaign signs were permitted, offering as best evidence posts that were not from Plaintiff's Facebook page, photographs not taken by Plaintiff, depicting signs placed no one knows where, bearing no date — under an ordinance that specifies no date for the placement of campaign signs. Compl. ¶¶ 69-72.

Two of Bernard's allegations were disproved by Bernard's exhibits — and they illustrate the hysteria described *supra*. Bernard's evidence for her claim that Plaintiff stared Bernard down at a campaign event consisted of six photographs of Plaintiff talking with voters — in none of them looking anywhere near the camera, because Plaintiff was looking at the voters Plaintiff was speaking with, while busy winning the straw poll that day. Compl. ¶¶ 76-79. And Bernard alleged — on what Bernard says Stile told Bernard — that Plaintiff flagged Michelle Stile's business Facebook page and caused its removal in retaliation for Stile's endorsement of Judge-Opponent. Plaintiff had never met or spoken to Stile. The exhibit Bernard attached to prove the allegation disproves it: it shows

13

that an account called "Breaking the Rules" sent Stile a phishing message; that Stile clicked the link; and that Stile's internet service provider intervened with a warning that the site was unsafe. Compl. ¶¶ 73-74. From that, the story grew — first that Plaintiff had taken down Stile's page, then that Plaintiff had committed what would be a felony — causing the denial of an authorized user's ability to transmit data is a felony of the third degree under Florida's Computer-Related Crimes Act, Fla. Stat. § 815.06(2)(b), (3)(a), and intentionally impairing the availability of data on a protected computer is a felony under the federal Computer Fraud and Abuse Act, 18 U.S.C. § 1030(a)(5), (c)(4) — with no fact to support any of it, and the Bar has advanced that felony allegation against Plaintiff ever since, on the strength of an exhibit that refutes it. Plaintiff does not administer that page and has no ability to remove it. Compl. ¶¶ 73-74. If the maintenance of a felony accusation against a lawyer, for two years, on an exhibit that disproves it does not demonstrate bad faith, nothing could. An accusation of crime is defamatory per se under Florida law; the Bar makes this one under the shield of various forms of immunity, with impunity — and the same immunity that forecloses any remedy at law is one more reason the remedy must come from equity — and from the federal statutes by which Congress abrogated Eleventh Amendment immunity — hence the need for this Court's intervention.

Plaintiff sent his sworn submission directly to Bar Counsel, Ashley Morrison. Morrison directed Plaintiff to the Bar's intake process — where Plaintiff had already submitted it, copying Morrison. The intake process closed it, stating that a finding by a court of competent jurisdiction that Bernard had made a false statement would be required before the Bar would act. Morrison took no action. A second sworn submission, concerning Stile — herself a complainant in

14

one of the seven files and the source of statements Bernard repeated to the Bar — was closed on the same stated basis. Compl. ¶¶ 89-90. On information and belief, the Bar has never asked either complainant a single question about any of the statements Plaintiff identified as false. Compl. ¶¶ 86-87. And when Plaintiff confronted Morrison with the submission during the February 26, 2025 sworn statement, the prosecutor's response was to ask which information Plaintiff meant. Plaintiff restated the history on the record, offered to have counsel send the submission to Morrison again, and entered it into the record as an exhibit. Morrison never requested it. Compl. ¶¶ 91-94. A prosecutor who has not received exculpatory material and learns of its existence under oath requests it. Morrison did not. U.S. Const. amend. XIV, § 1; cf. R. Regulating Fla. Bar 4-3.8 (Special Responsibilities of a Prosecutor). Whether Bar counsel prosecuting a quasi-criminal disciplinary proceeding is a "prosecutor" within the meaning of that rule appears untested. A regulator that holds every prosecutor in Florida to that standard should not hold itself to less.

The Oath of Admission the Bar charges Plaintiff with violating binds Morrison equally. It provides: "I will never reject, from any consideration personal to myself, the cause of the defenseless or oppressed, or delay anyone's cause for lucre or malice." *Oath of Admission to The Florida Bar*. The premises are set out *supra*: sworn proof of falsity resting on public records and on the complainants' own exhibits; a judicial-finding precondition imposed on Plaintiff's complaints and on no complaint against Plaintiff; complainants never questioned; exculpatory material identified under oath and never requested; and every documented-false allegation still advancing two years later. Compl. ¶¶ 67-99. From those premises one of two conclusions follows: indifference to

15

undeniable falsity, or intentional disregard of it. Under either, a prosecutor wielding the power Morrison wields has inflicted on Plaintiff, over two years, an injury no person in the United States should have to endure as the price of trying to help his community by running for public office and educating voters with truthful facts that were being withheld from them.

Morrison's treatment of the sworn statement itself completes the picture. Morrison's examination of Plaintiff spans 145 pages of the 162-page transcript; cross-examination by Plaintiff's counsel begins at page 151. Morrison adjourned the statement before cross-examination concluded and stated on the record that a continuation would be scheduled. A continuation was scheduled — and Morrison unilaterally canceled it without any discussion. It was never rescheduled, and the statement was never completed. By email dated April 21, 2026, Morrison confirmed in writing that the transcript of that incomplete statement, with exhibits, is before the Grievance Committee for its consideration, and that Morrison anticipates it as one of the Bar's exhibits at trial. Compl. ¶¶ 96-105. Morrison has used the cancellation to fix the record in the state she left it.

Absent force majeure or some other truly extraordinary circumstance, Plaintiff cannot imagine a court in this country that would permit what the Bar intends here: taking half of a sworn examination; stating on the record that the adversary's cross-examination will conclude at a scheduled continuation — thereby causing the adversary, in observance of the rules of decorum, to reserve for his turn what he would otherwise have said; canceling that continuation outright; and then submitting the truncated transcript to the adjudicating body, and ultimately to the court, as though it were a full and complete statement. Compl. ¶¶ 96-105. It is conduct that should shock the conscience of this Court —

16

and of the Supreme Court of Florida, and of everyone who works in lawyer discipline at The Florida Bar.

Now set that requirement against what the Bar demands of itself. The Bar has obtained no finding by any court that Plaintiff committed any act alleged in the seven consolidated matters — and has never required one — while advancing all seven toward a probable cause determination. Compl. ¶ 107. A judicial finding is a precondition when Plaintiff complains, and no condition at all when Plaintiff is accused. One allegation concerns conduct that occurred in open court, in the presiding judge's presence — and what actually happened there is this: Plaintiff remarked during a hearing that another attorney's paralegal was chewing gum. The presiding judge, in whose presence the conduct occurred, directed the paralegal to remove the gum and took no action of any kind toward Plaintiff — and after the hearing concluded, the judge called Plaintiff forward and told Plaintiff he had done a good job, it being Plaintiff's first appearance before her since she took office as a circuit judge. The complainant who reported the incident to the Bar was not in the courtroom. Compl. ¶¶ 109-112. Every allegation Plaintiff documented as false in August 2024 remains pending against Plaintiff today, and the Bar has held Bernard's self-refuting photographs for approximately two years while advancing the allegation they were attached to support. Compl. ¶¶ 77-80. A two-track evidentiary regime — proof demanded of the respondent's complaints, none demanded of the complaints against Plaintiff — is not the enforcement of professional standards, and Plaintiff is substantially likely to prevail on his equal protection and due process claims arising from it.

**III. Bar interrogated plaintiff about political plans, went silent for months, delivered, notified plaintiff of grievance committee vote on eve of qualifying.**

On February 26, 2025, Morrison personally conducted a sworn statement of Plaintiff — a proceeding Plaintiff was compelled to attend. Early in Morrison's interrogation, after establishing that this had been Plaintiff's first judicial campaign, Morrison asked: "So you don't have any intent to run again?" Later in the same interrogation Morrison asked whether Plaintiff had formed the "oversight committee" about judges Plaintiff had mentioned online, and, on learning Plaintiff had not, what its purpose would be. Compl. ¶¶ 385-387. Neither question bears on whether Plaintiff committed any past misconduct alleged in any complaint. Both probe Plaintiff's intended future political activity. Compl. ¶¶ 450-454.

After June 11, 2025, the consolidated matters went quiet — no communication of consequence for ten months and six days. The silence ended on April 17, 2026: the Friday immediately preceding the April 20-24 judicial qualifying week, when the Bar issued its Notice of Grievance Committee Review. Compl. ¶ 392. Plaintiff did not qualify. Compl. ¶ 539.

What stood between the notice and the qualifying deadline deserves to be stated plainly. To qualify was to commit to months of campaigning with a consolidated and false prosecution that the Bar had just signaled — after ten months of silence — was moving toward a probable cause determination: a determination that, if reached mid-campaign, would become public at the moment of maximum damage and be available to anyone who wished to use it. Compl. ¶¶ 392, 533-537. Whatever name that dynamic is given, its structure is the structure of leverage: file to run, and the matter advances into the open in the middle of the election; stay out, and it stays quiet because of no public interest. The Verified Amended Complaint pleads that the timing was calculated to have

18

exactly that deterrent effect, Compl. ¶¶ 533-540, and the classification challenged in Section V, *infra*, meant the file could not be dismissed at any level while the leverage operated. Compl. ¶¶ 307-310. Plaintiff stayed out. Compl. ¶¶ 539-541. DETERRED.

Retaliatory prosecution for protected political speech states a claim under 42 U.S.C. § 1983, and the speech at issue — a candidate's truthful statements about an opponent's record, and Plaintiff's political candidacy — is core political speech. The evidence of purpose here is not an inference stacked on an inference; it is a documented sequence: a prosecutor maps a lawyer's political future under oath, the agency waits, and the agency acts at the precise moment its action would most effectively deter Plaintiff from filing to run. It deterred Plaintiff. Defendants retain the same instruments and, on this record, the same willingness to use them against any future candidacy. Compl. ¶¶ 533-542. Plaintiff is substantially likely to prevail on his First Amendment retaliation claim.

### IV. *Abstention under Younger v. Harris does not apply.*

For the reasons set forth in the Verified Amended Complaint at ¶¶ 399-432, incorporated here by reference, abstention under Younger v. Harris, 401 U.S. 37 (1971), does not apply to this action.

### V. Bar continues prosecution under abolished rule known for abuse.

Judge-Opponent's complaint was classified as a "judicial referral" under former Rule 3-7.18 — An ordinary citizen's complaint could be dismissed by staff; a judge's complaint against his electoral challenger could not be dismissed at any level. Compl. ¶¶ 307-310.

Effective October 27, 2025, the Supreme Court of Florida amended the rule to exclude election-related complaints and to require that the referring judge have obtained the information in the course of official judicial duties. Compl. ¶ 309. Judge-Opponent's referral fails both requirements: it arises from the election, and Judge-Opponent's knowledge of Plaintiff's campaign came from being Plaintiff's opponent, not from any judicial function. The Bar's internal notices continue to describe and process the file as a judicial referral anyway. Compl. ¶ 306. The Bar's rulemaking petition admitted the abuse: it acknowledged that "the bar has received referrals from judges regarding opponents in judicial elections," and that such judges may be seen to have a personal interest. Compl. ¶ 492. The Bar sponsored the amendment that ended the practice — and then continued to give Plaintiff's file the treatment the amendment was adopted to end.

The amendment did not create the violation; the Constitution did. A preference track under which a sitting judge's complaint against his electoral challenger cannot be dismissed at any level was unconstitutional when this referral was filed in 2024. By January 3, 2025, at the latest, when it filed the petition sponsoring the amendment, the Bar knew that judges had been referring their electoral opponents and acknowledged in that petition that such judges may be seen to have a personal interest — and Plaintiff's file fit that description exactly. The Bar continued to process it under the preference anyway: through the petition, past the August 28, 2025 opinion, past the October 27, 2025 effective date, and to this day. Compl. ¶¶ 307-310. Continuing a practice after acknowledging in a filed petition that the practice is an abuse is not oversight; it is knowing continuation of a constitutional violation. And because the seven matters are consolidated for processing with the judicial referral, the preference

20

that forbids dismissal at any level travels with the consolidated whole — every complaint tacked on rides at the severity of the judge's — six complaints the Bar itself decided would travel with the judicial referral. Compl. ¶¶ 62, 307-310. Plaintiff is substantially likely to prevail on his claims arising from the continued application of the superseded classification.

## IRREPARABLE INJURY

"The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976). The chill here is not abstract. The pendency of these matters cost Plaintiff a candidacy: Plaintiff did not qualify in 2026 after the qualifying-week notice. Compl. ¶ 539. It has cost Plaintiff work: a city council member invited Plaintiff to apply for a city attorney position — selected through a public process, discussed at public meetings — and Plaintiff could not apply without subjecting himself to unfounded and unreasonable humiliation at the hands of the Bar. The chill deepens each day the prosecution pends. Compl. ¶ 450.

The injury on the horizon is irreversible by rule. Matters at the grievance committee stage are confidential. Rule 3-7.1(a)(1), Rules Regulating The Florida Bar. A probable cause finding is public, Rule 3-7.1(a)(3) — and so is a no-probable-cause closure, Rule 3-7.1(a)(4). For the past two years, Plaintiff has suffered immeasurable and unconstitutional injury at the hands of The Florida Bar as retaliation for trying to help his community by running for public office and for making true statements about a recently appointed judge who had never been tested by the electorate — and the Bar today appears as committed as ever, if not more so, to the destruction of Plaintiff in retaliation for it. Compl. ¶¶ 443-

21

454, 533-542. This Court is the court of last resort standing between Plaintiff and that injury.

And the pendency is itself the penalty. The complaints date from 2024. No hearing has been scheduled; no resolution date exists; Plaintiff cannot obtain a determination of the charges; and Plaintiff cannot exit — resignation while charges are pending carries the consequences of disbarment. Compl. ¶ 451. A respondent who prevails on every charge recovers none of what the proceeding took. Damages cannot remedy any of this, and Plaintiff has no adequate remedy at law. Compl. ¶¶ 450-454. The pendency of these misleading and largely false allegations for two years has already punished Plaintiff more than anything Plaintiff could have done would have deserved.

## BALANCE OF THE EQUITIES AND THE PUBLIC INTEREST

**I. After two years of doing nothing, Defendants will not be prejudiced. Public interest is best served by careful consideration of Constitutional questions.**

Plaintiff seeks to preserve the status quo — the proceeding exactly as it stands today — while this Court determines whether it was constitutionally initiated and conducted. Defendants have let these matters sit unresolved for approximately two years; a pause of weeks imposes no burden their conduct suggests they would notice, and they can identify no interest in prompt resolution that their handling of these matters reflects.

The public interest favors ensuring that proceedings arising from political speech in a judicial campaign are free of retaliatory taint and comply with federal disability law before they reach a public and irreversible stage. It is not served by a disciplinary system that publishes the governing law for candidates and then

22

prosecutes those who follow it — candidates who read the guidance and follow it are precisely the candidates the guidance exists to produce. And the public retains an interest in the continued competent representation Plaintiff provides to his existing clients, before the judges of the same circuit in which these proceedings arose. Compl. ¶ 453.

## SECURITY UNDER RULE 65(c)

Plaintiff requests that the Court waive the security requirement or set nominal security of one dollar. Defendants are at no risk of loss.

## CONDUCT AND PERSONS SUBJECT TO RESTRAINT

Plaintiff seeks an order restraining Defendants The Florida Bar, Ashley Morrison, and Joshua E. Doyle, and each of their officers, agents, servants, employees, attorneys, and any person in active concert or participation with them who receives actual notice of the order, from: (a) proceeding on any allegations related to the 2024 elections including within all matters concerning Plaintiff pending before The Florida Bar, designated in the Verified Amended Complaint as Bar Files A through G; (b) filing formal charges arising from those matters; and (c) taking any other prosecutorial action advancing those matters toward a public stage, pending further order of this Court.

## CONCLUSION

Plaintiff is aware of how this record reads. That so many actors and events converged on one lawyer over a span of months strains belief; Plaintiff knows it sounds overly coincidental. That is precisely why this motion asks the Court to take nothing on Plaintiff's word alone. Every fact recited here is pleaded in a complaint verified under penalty of perjury, and nearly every one rests on a

23

document: the complainants' own exhibits, the Bar's letters and emails, the court's records, the federal government's records, and a sworn transcript. The Court need not decide whether the pattern is believable; it need only read the documents.

The Court should grant the temporary restraining order immediately.

WHEREFORE, Plaintiff respectfully requests that this Court: (a) issue a temporary restraining order enjoining Defendants The Florida Bar, Ashley Morrison, and Joshua E. Doyle, and those described above, from (1) proceeding on any allegations related to the 2024 elections including within all matters concerning Plaintiff pending before The Florida Bar, designated in the Verified Amended Complaint as Bar Files A through G; (2) filing formal charges arising from those matters; and (3) any action advancing those matters toward a public stage, pending further order of this Court. (b) set a hearing on the preliminary injunction at the Court's earliest convenience; (c) issue a preliminary injunction maintaining that relief pending resolution of this action on the merits; (d) waive the security requirement or set nominal security of one dollar; (e) retain jurisdiction to enforce any relief granted; and (f) grant such other and further relief as this Court deems just and proper.

Dated: July 31, 2026
Respectfully submitted,
/s/ John Doe
John Doe, Plaintiff, Pro Se

24

## VERIFICATION

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the United States of America that I am the Plaintiff in the above-captioned action, that I have read the foregoing Motion, and that the factual statements contained in it are true and correct to the best of my knowledge, information, and belief.

Executed on July 31, 2026.
/s/ John Doe
John Doe, Plaintiff
(true identity on file with the Court under seal pursuant to the pending Motion for Leave to Proceed Under Pseudonym)

## CERTIFICATE OF SERVICE

I certify that on July 31, 2026, I served a copy of this motion, the Verified Amended Complaint, and every paper submitted in support of this motion, by electronic mail, on John Londot, Esq., Greenberg Traurig, P.A., counsel accepting service for Defendants, and that I have concurrently served the papers required by Local Rule 6.01(c) with respect to Plaintiff's prior motion for temporary restraining order.

/s/ John Doe
John Doe, Plaintiff, Pro Se

25

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

JOHN DOE,
      Plaintiff,

v.                         Case No. 6:26-cv-01481-JSS-RMN

THE FLORIDA BAR; ASHLEY MORRISON, in her official
and individual capacities as Bar Counsel for The Florida
Bar; JOSHUA E. DOYLE, in his official and individual
capacities as Executive Director of The Florida Bar; and
GYPSY BAILEY, in her official and individual capacities
as General Counsel for The Florida Bar,
      Defendants.
_____/

## TABLE OF AUTHORITIES

Attachment to: PLAINTIFF'S TIME-SENSITIVE VERIFIED MOTION FOR
TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION

### Cases

*Cohen v. California, 403 U.S. 15, 25 (1971)*..........................................................11

*Elrod v. Burns, 427 U.S. 347, 373 (1976)*...........................................................21

*Landmark Communications, Inc. v. Virginia, 435 U.S. 829, 841-42 (1978)*..................9

*Republican Party of Minnesota v. White, 536 U.S. 765 (2002)*..........................8, 9

*Siegel v. LePore, 234 F.3d 1163, 1176 (11th Cir. 2000)*.....................................4

*Winter v. Natural Resources Defense Council, Inc., 555 U.S. 7, 20 (2008)*................4

*Younger v. Harris, 401 U.S. 37 (1971)*...............................................................19

### Statutes and Regulations

18 U.S.C. § 1030(a)(5)......................................................................................14

28 U.S.C. § 1746..............................................................................................25

42 U.S.C. § 1983..............................................................................................19

### Rules

Local Rule 3.01(f)..............................................................................................1

Local Rule 6.01(a)(2)............................................................................................................3

Local Rule 6.01(c)..........................................................................................................3, 25

Local Rules 6.01...................................................................................................................1

Rule 3-4.3...........................................................................................................................11

Rule 3-7.1(a)(1)..................................................................................................................21

Rule 3-7.1(a)(3)..................................................................................................................21

Rule 3-7.1(a)(4)..................................................................................................................21

Rule 3-7.18.........................................................................................................................19