**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**ORLANDO DIVISION**

STEPHEN BROWN,
 *Plaintiff,*

v.                                                          Case No. 6:26-cv-1481-AGM-RMN

THE FLORIDA BAR; ASHLEY
MORRISON, in her official and
individual capacities as Bar Counsel for
The Florida Bar; JOSHUA E. DOYLE,
in his official and individual capacities as
Executive Director of The Florida Bar;
and GYPSY BAILEY, in her official and
individual capacities as General Counsel
for The Florida Bar,
 *Defendants.*

_____/

**PLAINTIFF'S MEMORANDUM OF LAW IN SUPPORT OF THE VERIFIED**
**AMENDED COMPLAINT (REGARDING ABSTENTION)**

For two years, an official arm of the Supreme Court of Florida has

prosecuted a lawyer for criticizing a judge — for that judge's own published

criticism of judges. The irony is not decoration; it is the accusation. Judge-

Opponent wrote and self-published a book describing judges as "robed priest-

kings" with unchecked power — a book that proposes stripping the courts'

jurisdiction and budgets, letting judges "keep their salaries" only because the

Constitution forbids reducing them while making them "pay their staffs and

expenses out of their own pockets," and, in its own words, "turning out the lights

and locking the door on some courthouses if it comes to that." *Court Zero: A*

*Guide to Judicial Activism for Revolutionaries and Regular Folks* 138–39 (2004) (self-published by Judge-Opponent). Judge-Opponent invoked that book at his campaign kickoff; Plaintiff's supposed "offense" was quoting the judge's published attack on the judiciary back to the electorate and questioning its wisdom. Perhaps a candidate for the next great LSAT logic game: a lawyer is being prosecuted, by an arm of the judiciary, for criticizing a judge for criticizing judges — in the judge's own words and nothing else. Verified Am. Compl. ¶¶ 18–19, 44–45, 120, 286. The same arm of the Supreme Court seeks to punish Plaintiff for reading from public records: the judge made his military service a centerpiece of his campaign — in uniform photographs posted without the disclaimers Department of Defense regulations require; Plaintiff obtained the judge's service records under the Freedom of Information Act and stated the duration those records reflect. The Bar charges that as disparagement. *Id.* ¶¶ 20–33. And because a disparagement theory stumbles on an inconvenient element — truth — the Bar backstops it with a lattice of catch-all provisions, none of which, as charged, defines "disparaging" or "unprofessional" or identifies any standard by which a true statement becomes either. *Id.* ¶¶ 301–304. Plaintiff cannot determine from the charging documents what speech he must refrain from to avoid further charges. *Id.* ¶ 305. Punishing true speech under undefined standards is a void-for-vagueness due process violation wearing a professionalism costume. And the reach of these matters

extends past the race entirely: to a photograph Plaintiff posted of United States troops escorting Black children into a desegregating school — troops Plaintiff called "real American heroes" — in reaction to news coverage of the seventieth anniversary of *Brown v. Board of Education,* in a post that does not mention Judge-Opponent at all, *id.* ¶ 234, and to three comic books published before Judge-Opponent even entered the race, which likewise never refer to him, *id.* ¶ 233. This is not the regulation of attorney conduct; it is the prosecution of a citizen's relationship to the Constitution itself. Seven consolidated accusations, every one of them concerning Plaintiff's speech critical of the judiciary. *Id.* ¶ 288. Two years of sworn refutations, supported by public records and the complainants' own exhibits, producing "no question to any complainant, no dismissal, no end." *Id.* ¶ 291. On these facts — none hyperbolic, each sworn — no objective observer could conclude that the forum prosecuting this speech can supply even the constitutional minimum of protection for it — or any of the other constitutional protections Plaintiff now invokes, for the first time in his life and he hopes the last, to defend his livelihood against bad actors hiding in plain sight.

Strip the doctrine away and the case is this: one judge with a record he preferred hidden — a self-published book attacking the courts that he now calls a "pamphlet," *id.* ¶¶ 18–19; a conviction for driving under the influence left undisclosed on his magistrate application, *id.* ¶ 123; a period of military service of

less than three years, where the West Point education the United States funded ordinarily obligates six, *id.* ¶¶ 29–30 — and one opposing candidate who believed the voters were entitled to that record, and who told them exactly the way the law wishes candidates would. Before speaking, Plaintiff obtained the Supreme Court of Florida's own guide for judicial candidates, *An Aid to Understanding Canon 7*; he read it several times a week throughout the campaign; he measured almost every statement he made against it. *Id.* ¶¶ 13–17. Before saying a word about the judge's military service, he obtained the service records themselves and said only what they showed. *Id.* ¶¶ 31–33. The Bar did not prosecute a reckless speaker. It prosecuted a careful one — which is the more chilling fact, because it teaches every Florida lawyer that no amount of diligence makes truth safe to say.

Two events frame what this proceeding is. In February 2025, the government summoned Plaintiff to a mandatory sworn statement and interrogated him, under oath, with no judge present, about his political intentions — whether he would run for judicial office again, and whether he would form a political committee about judges — questions a citizen of a free country is never supposed to have to answer to a prosecutor. *Id.* ¶¶ 385–388, 533. Fourteen months later, the Bar broke ten months of silence with a Notice of Grievance Committee Review issued Friday, April 17, 2026 — one business day before qualifying opened — a

reminder, delivered with a prosecutor's timing, of what running again would cost. *Id.* ¶¶ 392, 534.

Plaintiff raises abstention now, unprompted, because the question will occur to the Court and Plaintiff would rather answer it than evade it. The answer is that *Younger v. Harris*, 401 U.S. 37 (1971), does not fit this case — for three independent reasons. The damages claims cannot be dismissed under *Younger* at all. The equitable claims fall within the bad-faith and harassment exception, on sworn facts no federal court has ever held to warrant abstention. And the forum to which *Younger* would defer is the very instrument of the violation alleged.

## I. THE DAMAGES CLAIMS CANNOT BE DISMISSED UNDER YOUNGER. THAT IS NOT DISCRETIONARY.

Start with what abstention cannot reach. Plaintiff sues Morrison, Doyle, and Bailey individually for compensatory and punitive damages. No grievance committee can award that relief; no Bar referee will ever adjudicate it. The Supreme Court has been unequivocal: a district court "has no discretion to dismiss rather than to stay claims for monetary relief that cannot be redressed in the state proceeding." *Deakins v. Monaghan*, 484 U.S. 193, 202 (1988); *accord Quackenbush v. Allstate Insurance Co.*, 517 U.S. 706, 730–31 (1996) (abstention permits a stay of a damages action, never its outright dismissal). Whatever else the Court concludes, the individual-capacity damages claims stay in federal court.

**II. A PROSECUTION MAINTAINED FOR TWO YEARS WITHOUT PROBABLE CAUSE, WITHOUT SCREENING, AND ON A POLITICAL CLOCK IS THE BAD-FAITH EXCEPTION.**

*Younger* deference was built for good-faith enforcement. It has never protected prosecution as persecution. *Younger*, 401 U.S. at 54; *Dombrowski v. Pfister*, 380 U.S. 479, 490 (1965). In this Circuit, the question is whether the state proceeded "without a reasonable expectation" of a valid outcome. *Redner v. Citrus County*, 919 F.2d 646, 650 (11th Cir. 1990); *Wood*, 2022 WL 1742953 (unpublished) (applying that standard). The Verified Amended Complaint answers under oath, four ways.

*No probable cause — accusation by accusation.* Probable cause is assessed per accusation; probable cause for one charge does not launder the rest. *Williams v. Aguirre*, 965 F.3d 1147, 1159–62 (11th Cir. 2020); *Chiaverini v. City of Napoleon*, 602 U.S. 556 (2024). The complaint walks each consolidated accusation through the materials actually before Bar counsel and alleges — with the specificity of a pleading drafted against *Williams* — that none of them clears the bar. Verified Am. Compl. ¶ 535. A two-year prosecution with no accusation supported by probable cause is the thing *Younger*'s exception names.

*Charges no reasonable prosecutor could bring.* The complaint does not stop at the absence of probable cause; it alleges, accusation by accusation, that the

charged conduct is affirmatively protected by controlling law — including a campaign statement made in the very form the Supreme Court of Florida's own publication for judicial candidates describes — such that "[n]o reasonable prosecutor could believe that conduct controlling law protects violates a rule." Verified Am. Compl. ¶ 544. A charge that no reasonable prosecutor could bring in good faith admits of only one remaining explanation: an ulterior and malicious one. That is not rhetoric; it is the logical residue once good faith is eliminated, and the complaint pleads the elimination under oath.

*No screening — ever.* A prosecutor who expects to win culls what is weak. The Bar culled nothing. It advanced accusations whose "only evidence ever submitted is the complainant's own" unsworn narrative, *e.g.*, Verified Am. Compl. ¶¶ 585, 591, 597; accusations refuted by the complainants' own exhibits and by public records, *id.* ¶ 291; charges brought under rules facially inapplicable to the conduct they describe; an accusation aimed at satire, *id.* ¶ 133; an accusation of courtroom misconduct accepted from a complainant who was not present in the courtroom at all — secondhand assertion about a proceeding she never saw, advanced by the Bar regardless — when the presiding judge who actually was present took no action of any kind toward Plaintiff and complimented Plaintiff's performance when the proceeding ended, and the "inappropriate comment" turns out to have been the observation that a paralegal was chewing gum, *id.* ¶¶ 75, 109–

111, 753; and — setting the pattern from the first file — a complaint lodged immediately after Plaintiff told its complainant he intended to file a Bar complaint against *him*: a complainant's act of revenge, "resting on secondhand statements, refuted by the complainant's own exhibits, and advanced regardless." *Id.* ¶ 293. Wholesale advancement of the facially infirm, the refuted, and the retaliation-born is not prosecutorial judgment. It is sworn evidence that the outcome was never the point.

*The record, fixed mid-cross.* Morrison's own examination of Plaintiff spans 145 pages of a 162-page transcript. She adjourned the sworn statement before Plaintiff's cross-examination concluded, stated on the record that a continuation would be scheduled, scheduled it, unilaterally canceled it without any discussion with Plaintiff or his counsel, and never rescheduled it — so the statement was never completed and Plaintiff was never afforded the chance to finish his account. Verified Am. Compl. ¶¶ 96–103. Morrison then confirmed in writing that the incomplete transcript sits before the Grievance Committee and is expected to serve as a Bar trial exhibit. *Id.* ¶ 104. In the complaint's words, she "used the cancellation to fix the record in the state she left it." *Id.* ¶ 105.

*The political clock.* The sworn chronology is precise, and it should be stated precisely. On February 26, 2025, Bar counsel Morrison personally conducted a sworn statement of Plaintiff — attendance the Bar's process required, answers

given under oath, with no judge presiding. Verified Am. Compl. ¶¶ 385, 533. In it, Morrison asked Plaintiff — under oath, on the record — "So you don't have any intent to run again?", and later asked whether he had formed the "oversight committee" about judges he had referenced online, and what its purpose would be; Plaintiff answered that it would be "a political committee" to "inform the public about judges." *Id.* ¶¶ 386–387. The government compelled a citizen to disclose, under oath, his future electoral plans and his intent to form a political advocacy organization — inquiries that bear on no charged rule provision. *Id.* ¶¶ 388, 416. Then: silence. Ten months and six days passed after the Bar's last communication of consequence. *Id.* ¶¶ 391–392. The Bar's next act was the Notice of Grievance Committee Review issued Friday, April 17, 2026 — one business day before judicial qualifying opened on Monday, April 20. *Id.* ¶¶ 392, 534. Ten months of nothing, and then the Bar chose, out of more than three hundred available days, the single last business day on which a threat could still reach a candidate before qualifying. The complaint pleads what that timing was for: to deter a candidacy. That is not regulation of the practice of law. That is the state aiming its docket at an election.

*The screening body that screened nothing.* What happened next removes any doubt about whether this process exercises judgment. On July 9, 2026, the Supreme Court of Florida held Rule 4-8.2(a), Rules Regulating The Florida Bar,

unconstitutional as applied to the campaign speech there at issue. *The Florida Bar v. Crowley*, No. SC2020-0529 (Fla. July 9, 2026); Verified Am. Compl. ¶ 407. Six days later, the Grievance Committee found probable cause under that same rule, against Plaintiff's campaign speech, in all three matters charging it. *Id.* ¶ 408. Across seven matters, seven complainants, and thirty-three charged rule provisions, the Committee found probable cause as to all thirty-three. It eliminated nothing, narrowed nothing, distinguished nothing — not even a rule held unconstitutional as applied, in a campaign-speech case, the week before. *Id.* ¶¶ 408–409. As the complaint puts it: "A body that approves everything has reviewed nothing." *Id.* ¶ 410.

*The double standard.* The complaint also pleads the comparison that exposes the enterprise. When a sitting county judge disseminated unverified fraud accusations against her attorney opponent during her 2022 campaign, the Supreme Court of Florida disciplined her — a ten-day suspension and public reprimand. *Inquiry Concerning a Judge, Re: Hon. Mardi Levey Cohen*, No. SC2024-0992 (Fla. May 8, 2025); Verified Am. Compl. ¶ 473. But when Plaintiff reported to the Judicial Qualifications Commission that the spouse of his own judge-opponent — a member of that judge's campaign committee — disseminated false and disparaging information about Plaintiff during the campaign, the Commission took no action, and the judge received "no discipline, no reprimand, and no

consequence of any kind." *Id.* ¶¶ 474–475. The same conduct standards govern both candidates. *Id.* ¶ 472. In this race, the judge's side answered for nothing while the attorney's side answers for everything — thirty-three counts of everything. The asymmetry is not hypothetical; Florida has run this exact comparison before. When a lawyer running for county judge personally signed a fundraising letter, The Florida Bar prosecuted her, the Supreme Court of Florida publicly reprimanded her, and the Supreme Court of the United States affirmed — in the name of "public confidence in the integrity of the judiciary." *Williams-Yulee v. Florida Bar*, 575 U.S. 433 (2015). Yet when Judge-Opponent distributed campaign business cards bearing a QR code that resolved to a page prominently displaying a donation button, and Plaintiff reported it to the Judicial Qualifications Commission, the Commission took no action and asked not a single question. Decl. of Stephen Brown ¶¶ 3–4 (filed herewith). The rule that guards public confidence in the judiciary applies with full force to the lawyer and not at all to the judge. The principle condemning that asymmetry is as old as *Yick Wo v. Hopkins*, 118 U.S. 356, 373–74 (1886): a law fair on its face, administered "with an evil eye and an unequal hand," denies equal protection. Selective enforcement keyed to which side of a judicial election the speaker stood on is not public protection; it is the harassment the exception names.

*The repudiated mechanism.* These prosecutions traveled the elevated-review preference of Rule 3-7.18, Rules Regulating The Florida Bar, as it then stood — a mechanism so visibly turned by incumbent judges against their electoral challengers that The Florida Bar itself petitioned to amend the rule to exclude judicial-election referrals. The preference is gone. The prosecution it produced continues. On the complaint's allegations, what survives the amendment is not the public-protection rationale; it is the purpose.

*The first file, on its face.* Bar File A distills the enterprise into a single document. It was filed by Michele Bernard, who assisted Judge-Opponent's campaign — the complaint the pleading describes as "commissioned by Judge-Opponent's campaign." Verified Am. Compl. ¶¶ 49, 63. Before she filed it, the Bar's own Attorney Consumer Assistance Program instructed her to include only facts within her firsthand knowledge. *Id.* ¶ 64. She filed it anyway — resting "substantially on statements of what the complainant was told by others," *id.* ¶ 65 — and she filed it immediately after Plaintiff advised her that he intended to file a Bar complaint against *her*. *Id.* ¶ 66. So the Bar knew, from the face of its own file: its intake arm had warned her against secondhand accusations; she filed them anyway; she worked for the opposing campaign; she filed in retaliation. The Bar advanced that file for two years, *id.* ¶ 291, and in July 2026 counted every provision of it toward probable cause. *Id.* ¶¶ 408–409. A prosecutor who builds

probable cause on hearsay his own intake office warned the accuser not to submit is not pursuing discipline. He is laundering a campaign attack.

Binding precedent in this Circuit confirms that retaliatory purpose is itself the exception. In *Wilson v. Thompson*, 593 F.2d 1375, 1387 (5th Cir. 1979), the former Fifth Circuit held that a State has no legitimate interest in pursuing a bad-faith prosecution "brought to retaliate for or to deter the exercise of constitutionally protected rights," and in *Fitzgerald v. Peek*, 636 F.2d 943, 945 (5th Cir. Unit B Feb. 1981) (per curiam), it held that a showing of retaliatory purpose justifies an injunction regardless of whether valid convictions conceivably could be obtained. Both decisions bind this Court. *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc). The sworn allegations here — a prosecution timed to a candidacy, maintained without probable cause, advancing accusations born of complainant retaliation — are a *Wilson* showing. Under *Fitzgerald*, the theoretical possibility that some accusation might somewhere support discipline would not save abstention even if it existed. And this Circuit has enforced the rule in its own name: in *Cate v. Oldham*, 707 F.2d 1176, 1183–90 (11th Cir. 1983), the Eleventh Circuit held abstention inappropriate and sustained preliminary injunctive relief where a state officer turned legal process against a citizen in retaliation for the protected act of petitioning against the State — the same right the Bar's first-filed complaint punished here. Verified Am. Compl. ¶ 293.

The factors other circuits use confirm the same conclusion from every angle. In *Phelps v. Hamilton*, 122 F.3d 885, 889 (10th Cir. 1997), the Tenth Circuit asked whether the prosecution was "frivolous or undertaken with no reasonably objective hope of success," whether it was motivated by "retaliation for the defendant's exercise of constitutional rights," and whether it was "conducted in such a way as to constitute harassment and an abuse of prosecutorial discretion, typically through the unjustified and oppressive use of multiple prosecutions." The sworn record here answers all three: no probable cause on any accusation; a clock set to a candidacy; and seven consolidated matters carrying thirty-three charges against a single speaker's campaign speech. The *Phelps* plaintiffs lost because their twenty cases sat within a prosecutor's ordinary docket of hundreds of comparable prosecutions. Plaintiff's record runs the other way: the machinery that advanced everything against the attorney-candidate processed nothing against the judge's side of the same race. There is no ordinary docket here — there is one target.

*Wood* is not to the contrary — *Wood* is the measuring stick. The Eleventh Circuit rejected the bad-faith exception there because Wood offered conclusory assertions of political motive. Plaintiff offers a verified chronology, an accusation-specific absence of probable cause, an unwinnowed and internally refuted body of charges, and a state mechanism the state itself disowned. Plaintiff is aware of no decision — none — in which a federal court has abstained on a record like this

one. Where the exception is fairly raised on sworn allegations, abstention is inappropriate at the threshold, and certainly before any factual development. *Dombrowski*, 380 U.S. at 489–90.

One further difference between this case and *Wood* is written in the dates. Wood went to federal court while the state's file was still an investigation, from the premise that the state must be coming for him. Plaintiff's posture was the opposite. The first complaint was filed against him in June 2024, Verified Am. Compl. ¶ 66, and for nearly two years he filed no federal case — because he did not believe he would need one. He had faith, questioned at times but held, that someone at The Florida Bar would eventually look at accusations aimed at campaign speech, satire, comic books, and an observation about chewing gum, and decline to pursue them. Only on April 17, 2026 — when ten months of silence ended one business day before qualifying opened — did the purpose become unmistakable; Plaintiff invoked this Court's jurisdiction within twelve weeks. *Id.* ¶¶ 392, 394. Plaintiff does not arrive as a professional victim, practiced at claiming persecution; he arrives as a lawyer still surprised this is happening to him. A two-year record of waiting, trusting the process, and suing only when the process revealed its purpose is itself evidence that the bad faith alleged here is observed, not reflexive.

## III. YOUNGER PRESUMES AN ADEQUATE STATE FORUM. HERE, THE FORUM IS THE DEFENDANT.

An institution does not get to be both the offended party and the only court.

Yet that is the arrangement *Younger* would ratify here: the body prosecuting

Plaintiff for criticizing the judiciary is an arm of that judiciary, and the forum to

which this Court would defer is administered by the Defendants themselves.

*Middlesex County Ethics Committee v. Garden State Bar Association*, 457 U.S.

423, 432 (1982), conditions abstention on an adequate opportunity to raise the

federal claims in the state proceeding. Where the adequacy of the state tribunal is

itself the question the federal claims present, abstention is inappropriate. *Gibson v.*

*Berryhill*, 411 U.S. 564, 577 (1973).

Plaintiff is candid about the boundary of this argument. *Middlesex* itself

involved ethics committees that were arms of the New Jersey Supreme Court, and

the Court declined to *presume* that such a structure fails to safeguard federal rights,

457 U.S. at 435–37; *Kugler v. Helfant*, 421 U.S. 117, 124–27 (1975), likewise

refused to infer inadequacy from institutional structure alone. Plaintiff asks for no

presumption and no structural inference. *Gibson* turned on the adjudicators' own

interest in the outcome — and that is what is pleaded here, two ways. First, as

demonstrated fact rather than presumption: thirty-three of thirty-three approved,

nothing filtered in two years, and probable cause found under a rule the same

supreme court had struck six days earlier. Verified Am. Compl. ¶¶ 291, 407–410.

Second, as interest: the conduct being prosecuted is criticism of the judiciary itself,

so the institution that will render final judgment is the offended party — an interest in the outcome no less real than the *Gibson* board members' pecuniary stake. *Middlesex* withholds a presumption of inadequacy; it does not command blindness to a record of it.

The contrast with *Middlesex* runs deeper still. Adequacy there was demonstrated, not assumed: the New Jersey Supreme Court had itself taken up the disciplined lawyer's constitutional challenge for direct review — a high court standing open at the end of someone else's process. 457 U.S. at 436–37. Florida's structure is the inverse. Under Article V, section 15 of the Florida Constitution, the Supreme Court of Florida holds exclusive jurisdiction over lawyer discipline; the prosecuting Bar is its official arm, Verified Am. Compl. ¶ 5; and under Florida's settled standard the court is not bound by a referee's recommended discipline and reserves to itself the ultimate responsibility to fix the sanction — including a harsher one — without any evidentiary hearing of its own. The court here is principal of the prosecutor, keeper of the rules, and final sentencer in one. What *Middlesex* assumed due process would look like is not what this structure delivers.

Adequacy fails on the sworn record in two further, independent ways. The first is notice. Attorney discipline is "quasi-criminal," and due process entitles the accused lawyer to fair notice of the charge against him. *In re Ruffalo,* 390 U.S. 544, 550–51 (1968). The stakes fix the standard: what these proceedings threaten is

exclusion from the practice of law — a person's livelihood and profession — and due process has constrained that power since *Schware v. Board of Bar Examiners*, 353 U.S. 232, 238–39 (1957). The complaint alleges that after two years Plaintiff still cannot determine from the charging documents which of his statements are alleged to be disparaging or what standard the Bar applied in so characterizing them, Verified Am. Compl. ¶ 304; that the Bar has identified no such standard at all, *id.* ¶ 302; and that Plaintiff cannot determine what speech he must refrain from to avoid further charges, *id.* ¶ 305. A forum in which the accused cannot ascertain what he is accused of doing is not a forum in which he can "raise" anything — there is no opportunity, adequate or otherwise, to defend against an unintelligible charge.

Due process constrains the shape of a prosecution, not merely its paperwork. A charging authority does not get to throw everything at the wall and see what sticks: thirty-three provisions across seven matters, advanced wholesale — including accusations of conduct the complaint alleges Plaintiff could not have committed and that no identified rule reaches — produce a confusion that is itself a deprivation. And the confusion is combinatorial: because each charged provision spans seven matters and dozens of discrete factual assertions, and the charging documents never say which facts are said to support which charge, Plaintiff is left to guess which of the possible pairings — most of them resting on refuted

assertions or constitutionally protected speech — he must be prepared to defend. Verified Am. Compl. ¶¶ 301–305. The accused must answer every permutation at once, at ruinous cost, while the accuser is never put to any election or precision. A fair-notice guarantee, *Ruffalo*, 390 U.S. at 550–51, means little if it can simply be buried under volume. And Plaintiff will say the next thing advisedly: a state charging authority that compels a citizen's sworn answers about his electoral plans and his intent to form a political committee, goes silent for ten months, moves against him on the Friday before qualifying week, then approves all thirty-three charges without eliminating a single one — six days after the State's highest court struck the leading rule as applied to this very category of speech — engages in conduct that should shock the conscience of the court reviewing it. *Rochin v. California*, 342 U.S. 165, 172 (1952).

The second is the filter that never functioned. An "adequate opportunity" presupposes a tribunal that responds to what is put before it. On the complaint's sworn allegations, two years of documented refutations — public records, the complainants' own exhibits, sworn responses — have never once resulted in the dismissal of a single accusation, or even a question to a single complainant. Verified Am. Compl. ¶ 291. A process that has filtered nothing, ever, no matter what the accused proves, is not an adequate forum in any sense *Middlesex* contemplates. It is a conveyor.

The ADA claim makes the point concrete. Plaintiff does not ask this Court to adjudicate any disciplinary accusation. He alleges that the Bar denied reasonable accommodations in its own process — that the procedure itself is the violation, down to the structural level: the Bar maintains accommodation procedures for complainants while providing none for respondents. Verified Am. Compl. ¶ 384. And the fusion of roles is personal, not abstract: Plaintiff's accommodation requests were routed through, and answered by, Morrison — the prosecutor herself, announcing the denial in the passive voice, *id.* ¶¶ 363–367 — while the Bar's unpublished ADA coordinator is, per Morrison, the Bar's own General Counsel: Defendant Bailey, who reviewed and approved the denial. *Id.* ¶ 8. And by the Bar's own document: on June 11, 2025 — the day the file went silent — Morrison issued, over her own signature, a notice reassigning the investigation of Judge-Opponent's own complaint "to the following member for investigation: Ashley Taylor Morrison, Bar Counsel." Decl. of Stephen Brown ¶ 6 & Ex. B. The prosecutor appointed herself the investigating member, in the judge's case. That is the prosecutor walking into the grand jury room and taking a seat. The rules complete the picture: three members constitute a quorum of a grievance committee, Rule 3-7.4(g)(1), Rules Regulating The Florida Bar; committee action requires only a majority of those voting, "which majority must number at least 2 members," Rule 3-7.4(g)(3); and the investigating member may not vote on the

matter investigated — it is the evidence-shaping seat, not a voting one. *Id.* Thirty-three charges could thus be approved on as few as two votes, after a presentation shaped from the seat the prosecutor assigned herself. She did not need to control the vote; she needed to control the evidence. Every lever of pre-adversarial quality control — intake, prosecution, the investigative seat, the accommodation process — is manned by the same staff of the same court that will render final judgment. Sending these claims "back" to the process that produced them is not comity; it is referral of the complaint to the accused.

But one thing the ADA claim is not is severable. The Court should not be invited — and Plaintiff does not invite it — to retain the ADA counts and abstain on the rest. The complaint pleads the accommodation denials as instruments of the retaliation, not as a parallel grievance: the same officials who advanced thirty-three unscreened charges against Plaintiff's speech are alleged to have denied him the accommodations that would have let him defend against them, on the same timeline, in the same proceeding. The ADA violations are part of the proof of the retaliatory prosecution — the disability process was used as a weapon within the persecution rather than honored as the right it is. Splitting the case would sever a single course of conduct into two forums, guarantee duplicative records on identical facts, and leave the retaliation claims — the claims that explain the ADA conduct, just as the ADA conduct explains the retaliation — in the hands of the

institution accused of both. The claims stand or stay together, and Part I independently requires that the damages claims, ADA included, stay.

Finally, the structure of Florida attorney discipline means that abstention here would not postpone federal review of Plaintiff's federal claims — it would extinguish it. The Florida Bar is an official arm of the Supreme Court of Florida. Verified Am. Compl. ¶ 5. Unlike the ordinary administrative scheme that ends in review by an independent court, this one culminates in a ruling by the very court whose arm is prosecuting; the tribunal of last resort and the principal of the prosecuting party are the same institution. And once that ruling is final, no federal district court may revisit it. *Rooker v. Fidelity Trust Co.*, 263 U.S. 413 (1923); *District of Columbia Court of Appeals v. Feldman*, 460 U.S. 462, 482–86 (1983). The only Article III review that would ever remain is a petition for certiorari — a form of review granted in a small fraction of one percent of the petitions filed each Term. To abstain in this posture is not to defer the federal forum; it is to deny it, permanently, in favor of a process that ends inside the institution complained of. Plaintiff says this plainly, so that the record reflects it: a decision to abstain here would be, as a statistical certainty, a decision to close this case without any review above the people sought to be reviewed.

## IV. CONCLUSION

Section 1983 was not written for ordinary cases. Congress enacted it in 1871 because the state institutions of that era — courts included — could not be relied upon to protect federal rights against the very state actors violating them, and its "very purpose was to interpose the federal courts between the States and the people, as guardians of the people's federal rights." *Mitchum v. Foster*, 407 U.S. 225, 240–42 (1972). That history counsels its greatest caution precisely where this case sits: where the rights at stake are fundamental — speech, political participation, equal access — and where the state apparatus said to violate them is the same apparatus to which deference is proposed.

Nor is the question academic or the timing elective. When Plaintiff filed this action on July 10, 2026, no formal complaint had been filed against him in the Supreme Court of Florida; every matter stood at the investigative stage. Verified Am. Compl. ¶ 394. Five days later the Grievance Committee found probable cause on all thirty-three provisions; the finding became final on July 29, 2026. *Id.* ¶¶ 408–409, 415. The injuries alleged are ongoing, accelerating, and irreparable: "The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976).

Because this is Plaintiff's own memorandum, he will close with candor. For two years Plaintiff has litigated under the sincere and continuous fear that no forum

will protect him: not the state's, because the prosecuting body is an arm of the court that will render final judgment, and two years of documented refutations have never moved it; and not the federal courts, because at any moment a deference doctrine might hand the case back to the institution complained of and close the federal courthouse behind it. That fear is not an argument, and Plaintiff does not offer it as one — the arguments are in Parts I through III. But the fear is itself a measure of what is at stake in the abstention question: whether a lawyer prosecuted by an arm of a state's highest court for criticizing that state's judiciary has, anywhere in this country, a court that will hear him. Two years into this, Plaintiff feels like a zebra on the savanna, caught between the hyenas circling and salivating and a noble, regal lion — a lion with no hunger of his own, no quarrel of his own, and an honorable reluctance to disturb the balance of the wild. That reluctance has a name in the law: comity. It is a real virtue, and *Younger* enshrines it. But comity presumes two sovereigns going about legitimate business, and there is nothing balanced about hyenas. The zebra does not ask the lion to rule the savanna. He asks him to rise, once, and act — because that is what § 1983 promised: that when the state itself is the predator, the lion gets involved.

Abstention doctrine manages friction between two legitimate proceedings. On the sworn record here there is only one: this one. The Court should decline to

abstain. If the Court is inclined to consider abstention notwithstanding, Plaintiff respectfully requests full briefing before any dismissal.

**CERTIFICATION OF COMPLIANCE WITH STANDING ORDER REQUIRING DISCLOSURE OF THE USE OF ARTIFICIAL INTELLIGENCE**

Plaintiff's separately filed Certification of Compliance with Rule 11, addressing the use of artificial intelligence in Plaintiff's filings in this action, accompanies this memorandum and is incorporated by reference.

Dated: August 10, 2026

Respectfully submitted,

/s/ Stephen Brown
Stephen Brown
509 S. Chickasaw Trail #286
Orlando, Florida 32825
(407) 956-2172
stephen@brownandrice.com
Plaintiff, Pro Se (Fla. Bar No. 43406)

**CERTIFICATE OF SERVICE**

I certify that on August 10, 2026, I filed this Memorandum via CM/ECF and, no counsel having appeared for Defendants, served a copy by email to the address previously used for correspondence with counsel who has accepted service-related correspondence for Defendants.

/s/ Stephen Brown
Stephen Brown, Plaintiff, Pro Se (Fla. Bar No. 43406)